Filed 2/28/22  Schrack v. Dwyar CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ANGELA SCHRACK,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>EDWARD DWYER, as Successor in Interest, etc.,<br><br>    Defendant and Respondent. | D078257<br><br><br><br>(Super. Ct. No. 37-2015-00016808-CU-BC-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Christine K. Goldsmith, Judge, retired.  Affirmed.

Iredale and Yoo and Eugene Iredale for Plaintiff and Appellant.

Daniel R. Salas for Defendant and Respondent.


Plaintiff Angela Schrack appeals from the judgment for defendant Edward Dwyer, the successor-in-interest to the Estate of Lee O'Denat, following the grant of summary judgment under Code of Civil Procedure

section 437c.[1] The trial court[2] found Schrack failed to carry her burden to establish a triable issue of material fact in support of her claims against O'Denat (now his estate) for breach of oral or implied contract, based on the seminal case of *Marvin v. Marvin* (1976) 18 Cal.3d 660 (*Marvin*).[3]

Schrack and O'Denat met in the 1990's while living on the east coast. They dated, but lived separately until 2001, when O'Denat moved in with Schrack and their son, born in 1999. They had a second son in 2006; and lived in Pennsylvania until 2007, when they moved to Arizona. After their move, O'Denat's business WorldStar Hip Hop (WSHH) took off, becoming tremendously popular and lucrative. They had a third child, a daughter, in 2009, and moved to San Diego in early 2014.

Their relationship, which had been "rocky" for years, ended in May 2014. Within months of their breakup, O'Denat filed an action to establish paternity of the three children, and Schrack filed a separate action to dissolve their Pennsylvania common law marriage and divide what she claimed were

---

[1]    All further undesignated statutory references are to the Code of Civil Procedure.

[2]    On February, 9, 2015, Schrack and O'Denat entered into a stipulation, approved by the presiding judge of the Family Law Court of the San Diego County Superior Court, that retired superior court judge Christine Goldsmith would "be the judge for all purposes" and act "as a privately compensated temporary judge." For ease of reference, we sometimes will refer to Judge Goldsmith, Ret., as the court or trial court.

[3]    The court separately found summary judgment was proper based on Schrack's failure to follow the procedural requirements in section 437c, subdivision (b)(3). Because, as we explain, the court properly granted summary judgment based on its finding there were no triable issues of material fact, we find it unnecessary to decide whether summary judgment was also properly granted on this procedural ground.

community assets, as they had never married.  Both of those cases, as well as the instant case Schrack filed in May 2015, were heard by Judge Goldsmith, Ret.

In her *Marvin* complaint, Schrack alleged she and O'Denat agreed in "January 2000" to "pool their earnings, income and assets" in return for her providing household services (2000 Pooling Agreement).  Schrack claimed she was a beneficial owner in WSHH, O'Denat's primary asset that, with one exception not relevant to the issues on appeal, was titled in his name only.

In January 2017, O'Denat passed away at the age of 43.  Dwyer, as successor-in-interest of O'Denat's estate, substituted into this case.  In September 2017, Schrack submitted a verified creditor's claim for $30 million in the *Estate of O'Denat* probate proceeding initiated by Dwyer.  Schrack's creditor's claim was entirely based on the existence of the alleged 2000 Pooling Agreement.[4]

In February 2020, Dwyer moved for summary judgment/adjudication (Motion), claiming as a matter of law there was no agreement between O'Denat and Schrack to pool their assets.  In April 2020, with trial scheduled to begin the following month, Schrack was deposed and for the first time asserted that in 2009 or 2010 she and O'Denat orally modified their original 2000 Pooling Agreement and stated that she was no longer claiming a beneficial ownership interest in WSHH and his estate's other assets.  Schrack maintained her *Marvin* claims were now based on a promise by O'Denat to provide her with lifetime support and, upon his death, for her to receive 25 percent of his estate (2010 Agreement).

---

[4]    As part of her 2017 Creditor's Claim, Schrack also sought $11.52 million in child support, or $80,000 per month for 12 years.

In granting summary judgment for Dwyer, the trial court refused to consider any evidence of the 2010 Agreement and found this purported agreement gave rise to "new" unpled claims that Schrack "first articulated" after the Motion had been filed, when the five-year limitations period for an action to be brought to trial was about to expire. (See § 583.310.)[5]

On appeal, Schrack does not contest the court's finding there is insufficient evidence to support the existence of a pooling agreement between her and O'Denat. Instead, she relies exclusively on evidence of the unpled 2010 Agreement in arguing summary judgment was improper. Specifically, she argues the purported 2010 Agreement was not a new claim or theory, but instead was within the scope of her three *Marvin* claims she "generally and broadly alleged" in her May 2015 "form complaint." Schrack therefore argues the court erred in excluding all evidence of the 2010 Agreement.

As we explain, we agree the 2010 Agreement is a new, previously unpled claim or theory offered by Schrack to defeat the Motion. Because Schrack never moved to amend her complaint to allege this new claim or theory, we also agree the court properly excluded all evidence of the 2010 Agreement in granting the Motion. In light of Schrack's tactical decision to rely exclusively on the existence of the 2010 Agreement in support of her claims of error on appeal, we independently conclude summary judgment was proper.

---

[5]    In its July 14, 2020 order granting the Motion, the court noted the five-year statute to bring this action to trial would have expired on or about May 20, 2020, but was "administratively continued" due to the pandemic. As a result, the Motion hearing was continued from April 21 to June 26, 2020, and the trial from May 15 to August 3, 2020.

## OVERVIEW

Schrack and O'Denat met in the 1990's while she was living in Pennsylvania and he in Maryland. Neither Schrack nor O'Denat then made or had a lot of money. Over the next three to four years, they dated, although not exclusively. In December 1999, their oldest son Q. was born. At his birth, Schrack and O'Denat were still living in different cities.

In 2000, Schrack enrolled in college to become a licensed practical nurse (LPN). In 2001, O'Denat moved in with Schrack and their son Q. "The parties' finances were stretched very thin," as O'Denat then was receiving unemployment benefits and Schrack public assistance. In summer 2002, Schrack graduated with an LPN degree. The family lived in Pennsylvania until 2007.

While in Pennsylvania, O'Denat began selling mixtapes directly to the public and working with various hip-hop music artists. In 2005, O'Denat started the web site www.worldstarhiphop.com. In November 2006, their second son L. was born.

In October 2007, with little money, the family moved to Arizona and ultimately settled in Scottsdale. After the birth of their third child A. in November 2009, O'Denat began to earn enough money to hire a full-time nanny to help Schrack with the care of the children. During this period, Schrack stopped working as an LPN and O'Denat's hip-hop business "took off," requiring him to travel an average of two weeks per month. In spring 2009, O'Denat suffered a heart attack.

In 2011, O'Denat created the revocable Trust Agreement of Lee Q. O'Denat Trust (2011 O'Denat Trust) to "hold title to [his] assets and designate beneficiaries of [his] estate." As relevant here, under the heading "**SPECIFIC GIFTS**," the 2011 O'Denat Trust provided:

5

"The Trustee shall distribute the following specific gifts to **ANGELA SCHRACK** only *if* she survives the Trustor *and was residing with him at the time of his death*:

"1.  The Trustor's primary residence, currently located [in] . . . Scottsdale, Arizona; SUBJECT to all liens and encumbrances.

"2.  Any and all automobiles owned by the Trustor at the time of his death."  (Italics added.)

Under the separate heading "**FUND ANGELA SCHRACK TRUST**," the 2011 O'Denat Trust further provided:

"*If* ANGELA SCHRACK survives the Trustor *and was residing with him at the time of his death*, the Trustee shall allocate ONE-FOURTH (1/4) of the total Trust Estate, after administrative expenses, but before the gifts in paragraph B above, for the benefit of ANGELA SCHRACK, to be held as provided in Article V."  (Italics added.)

In early January 2014, the family moved to San Diego County. O'Denat moved first, and Schrack and the children followed shortly thereafter.  Prior to Schrack moving, she agreed to consult with a mental health expert at the request of O'Denat.  In the spring of 2014, Schrack was diagnosed with bipolar disorder.

The relationship of the parties, "which had been rocky for years," hit a breaking point on May 25, 2014.  On that day Schrack experienced severe mental health symptoms that led to her being placed on a 72-hour involuntary hold.  As a result of the May 25 episode and Schrack's prior mental health issues, O'Denat severed their "cohabitation/boyfriend-girlfriend relationship."

O'Denat on April 8, 2015 amended the 2011 O'Denat Trust, naming Dwyer as successor trustee and executor of his estate and, if he was unable to serve, a bank as the alternate successor trustee (2015 O'Denat Amended

6

Trust). O'Denat designated himself as the primary beneficiary of the amended trust. Upon his death, the 2015 O'Denat Amended Trust allocated specific gifts to O'Denat's mother and his siblings, with the remaining proceeds to "be divided into three (3) equal shares, based upon the date of death values, and allocate[d] one (1) equal share to a separate trust for the benefit of each of Trustor's children," Q., L., and A.

In another section titled "**DISINHERITANCE**," the 2015 O'Denat Amended Trust provided:

> "I have consciously not named issue of my father other than my siblings in Article Two, Section A of this Trust, or ANGELA SCHRACK under the terms of this document."[6]

## LEGAL PROCEEDINGS

### Paternity Action

Within a month following their breakup, O'Denat filed a petition to confirm his paternity of the children and determine custody, support, and visitation (San Diego County Superior Court case No. DN179371) (Paternity Action). In his petition, O'Denat also requested the court award him sole legal custody of the children, with Schrack to have "reasonable supervised visitation." O'Denat based this request on what he claimed were Schrack's longstanding mental health issues.

As noted, the parties stipulated that Judge Goldsmith, Ret., would hear and decide the issues in the Paternity Action, which culminated in the court's June 30, 2016 "Findings of Fact and Conclusions of Law." The June 30 order

---

[6] In his 2016 Last Will and Testament, O'Denat similarly provided that he "consciously" had "not named" Schrack as a beneficiary under his will. On January 8, 2016, O'Denat executed a First Amendment to the 2015 O'Denat Amended Trust in which he reaffirmed that Schrack was not a beneficiary of his trust.

7

covered such subject matters as child and spousal support, payment of attorney fees, and taxes.

## Dissolution Action

Shortly after O'Denat filed the Paternity Action, Schrack on July 14, 2014 filed a petition for dissolution of common law marriage (San Diego County Superior Court case No. DN179531) (Dissolution Action). Regarding the date of marriage, Schrack's petition provided "TBD," and used June 1, 2014 as the date of their separation. Schrack listed as community assets "funds in bank accounts under the control of Respondent/Husband" and "[b]usiness entities in the control of Respondent/Husband" among other property. She also sought physical custody of the children and child support.

In early November 2014, Schrack amended her petition to provide that she and O'Denat were married in Pennsylvania on October 27, 2002 under the state's common law.

The Dissolution Action was tried over 17 days on the "bifurcated issue of the existence or non-existence of a common law marriage and whether or not [Schrack] should receive *pendent lite* spousal support and an attorney's fees award. . . ." In a 13-page Statement of Decision and Order dated August 16, 2015, the court dismissed the Dissolution Action with prejudice, finding that Schrack's testimony she and O'Denat "exchange[d]" "words in the present tense that would have established [under Pennsylvania law] a common law marriage between her and [O'Denat]" not credible; that Schrack "failed to carry her burden of proof by clear and convincing evidence that the parties entered into a common law marriage at any time"; and therefore, that Schrack had "no good faith belief that she is a 'putative spouse'" under California law.

8

**Probate Action**

O'Denat died on January 23, 2017. In April 2017, Dwyer initiated a probate proceeding for O'Denat's estate. (*Estate of O'Denat*, San Diego County Superior Court case No. 37-2017-0012101-PR-PW-CTL) (Probate Action). Letters testamentary appointing Dwyer executor were issued on May 3, 2017. Dwyer as successor trustee assumed control of the assets of the 2015 Amended O'Denat Trust, "which include[d] all of [O'Denat's] assets, including his ownership interest in the Internet website, 'worldstarhiphop.com' and the business entities under which the business known as [WSHH] is conducted. Those are (a) Qworldstar, Inc., a Delaware corporation, incorporated May 8, 2013, which operated, and now operates the business of (b) [WSHH], and (c) LO 337 IP Holdings, LLC, a Delaware limited liability company, formerly known as LO 337, LLC, formed May 30, 2013, which holds title to the Internet websites and all of the tradenames used by the WSHH business."

On September 22, 2017, Schrack filed a verified creditor's claim in the Probate Action (2017 Creditor's Claim). As noted, she sought $30 million based on the parties' 2000 Pooling Agreement. In support of her Claim, Schrack under penalty of perjury stated: "Lee O'Denat ('O'Denat') entered into an agreement with claimant Angela Schrack in January 2000 *to pool their earnings, income, and assets*. In June 2014, O'Denat breached that agreement by refusing to share the earnings, income, and assets they *jointly owned*. The primary asset is *ownership* of the [WSHH] brand, trademark, and related intellectual property. The Worldstar companies are currently controlled by Ed Dwyer. Schrack is entitled to *fifty percent ownership* of the Worldstar companies and *half of the assets of the estate and trust*. A copy of

9

the pending complaint is attached and incorporated by reference (the 'Marvin' Claim)." (Italics added.)

On September 28, 2017, Dwyer gave notice of his rejection of the 2017 Creditor's Claim. In this notice, Dwyer estimated the value of O'Denat's estate at $26,729.18. From the record, it appears Schrack never moved to amend her 2017 Creditor's Claim or seek any other relief in the Probate Action.

### *Marvin* Action

On May 20, 2015, Schrack filed the instant case (*after* the Dissolution Action had been filed but *before* the court dismissed it with prejudice). As noted, she asserted causes of action for breach of oral or implied contract, and quantum meruit, based on her contention that O'Denat breached the parties' 2000 Pooling Agreement on June 1, 2014 by refusing to share "earnings, income and assets." Schrack never amended her complaint and thus the May 2015 complaint is the operative pleading in this case.

In October 2015, Schrack and O'Denat stipulated to have Judge Goldsmith, Ret., also decide the instant case. In October 2018, Dwyer, as successor-in-interest to the estate of O'Denat, substituted into this case.

On January 16, 2020, the parties attended a case management conference. The court set the hearing on Dwyer's Motion for April 21, 2020, and if necessary, trial for May 15, 2020. In setting the trial date, the court recognized the mandatory 5-year dismissal statute (§ 583.310) was then set to expire on or about May 20, 2020.

### Summary Judgment/Adjudication Motion

On February 6, 2020, Dwyer filed his voluminous Motion. As relevant to the issues on appeal, Dwyer argued there was no evidence O'Denat and Schrack in 2000, or at any other time, agreed to pool their "earnings, income

10

and assets" such that Schrack was a beneficial owner in any asset owned by O'Denat's estate, including WSHH. Relying on Evidence Code section 662 (discussed *post*), he further argued Schrack needed to meet the heightened clear and convincing evidentiary standard to show O'Denat's intent to pool their assets titled in O'Denat's name.

In opposition, Schrack did not offer evidence to support her assertion of the existence of a pooling agreement created in 2000. Instead she offered evidence based on oral promises she maintained O'Denat made in 2009 and 2010.

### Schrack's Deposition

Due to the pandemic, the dates for the summary judgment hearing and trial were extended by administrative order. In mid-April 2020, Schrack appeared for her deposition. She testified that after O'Denat's heart attack in 2009, she pressed him "about getting something written up, getting something done" to ensure she and the children would not "be left hanging if he passed away." Schrack stated O'Denat in response told her he would remain the "primary income earner" while she took care of the household and the children, and helped him manage his medical issues; and that he in return "would make sure that [she] and the children were taken care of forever."

Schrack explained that in 2011 "when we had the trust drawn up," upon O'Denat's passing the WSHH business would be sold, and that "taking care of [her] always translated into [her receiving] 25 percent" of O'Denat's estate, in addition to a "monthly allowance"; that O'Denat's mother also would receive 25 percent of his estate; and that the balance of his estate would be "distributed evenly" among their three children.

11

On follow-up questioning, Schrack was asked if she still took the position that she was "entitled to 50 percent of the value of [WSHH]." The following colloquy ensued in response:

"A [Schrack]  No, I didn't say 50 percent.

"Q [Dwyer's Attorney Mr. Salas]  It says 50 percent share here [in Schrack's responses to form interrogatories (discussed *post*)].  So that's not your position today; right?

"A  It—the way I understood it was it had [. . . . ] [¶] Yes.

"Q  And on what do you base that claim?  Is that the agreement you talked about before between you and [O'Denat] in or about 2010?

"[¶] . . . [¶]

"A  It was what was drawn up in the trust.  The way everything was explained was the company—basically, the company would be sold, and that's how the money would filter out.  If the company wasn't sold, I mean, to me, it's 25 percent.

"[Schrack's Attorney Mr. Iredale]  Mr. Salas, just since we're going back and forth between the witness's understanding and the legal positions being asserted, we assert that she has a right to what is provided in the trust of April 15, 2011.  No more, no less.

"Q  Is that correct, Ms. Schrack?

"[Schrack's Attorney]  Do you agree with my statement that I just put on [the record]?

"[Schrack]  Oh, yes."

### The Motion Hearing

At the June 26, 2020 hearing on the Motion, Dwyer argued Schrack's *Marvin* claims were limited to the purported 2000 Pooling Agreement, in which she alleged being an owner in all "earnings, income and assets" she

and O'Denat acquired during their 13-year relationship, including being a beneficial owner in WSHH, his estate's most valuable asset. Dwyer asserted Schrack confirmed the source of her *Marvin* claims in her 2017 Creditor's Claim in the Probate Action, and in discovery responses.

Dwyer further maintained that, at Schrack's April 2020 deposition, she presented materially different, unpled *Marvin* claims. According to Dwyer these new claims were not based on Schrack being an alleged owner of the "pooled assets" she and O'Denat had accumulated. Instead, Schrack admitted O'Denat was the sole owner of all of the assets, including WSHH, and she now maintained that O'Denat "promise[d]" to support her "forever" and leave her 25 percent of his estate under terms similar to those provided in the 2011 O'Denat Trust. Dwyer emphasized Schrack's opposition to the Motion was based entirely on the unpled claims arising from the purported 2010 Agreement, and not on the pleaded 2000 Pooling Agreement.

In response, Schrack maintained that her May 2015 complaint was a "basic form complaint" in which the "allegations are made rather broadly and generally." She asserted her claims arising from the purported 2010 Agreement were not new, but instead were based on *Marvin* and O'Denat's breach of an oral or implied contract. She argued that only her "measure of damages" had changed but not her underlying "injury."

Schrack confirmed she opposed the Motion solely on the basis that "she is entitled to . . . care and maintenance for the rest of her life, consistent with the parties' agreement, and a value—certain value of [WSHH]" based on the 2011 O'Denat Trust; and *not* that she was "entitled to any type of ownership claim in [WSHH]." Schrack acknowledged the 2017 Creditor's Claim she asserted in the Probate Action was based on her being an owner of assets she

13

and O'Denat accumulated, but argued that was a separate proceeding and "is not what is being advanced by [her] in this case."

### The Court Grants Summary Judgment

In its 10-page July 14, 2020 order granting the Motion, the court reviewed the procedural history of the parties' litigation, including the Paternity and Dissolution Actions it also had decided. The court observed that, had it determined in the Dissolution Action O'Denat and Schrack were legally married under Pennsylvania common law, it would have evenly divided the assets they accumulated during their relationship, including WSHH, and likely would have made a spousal support order from O'Denat to Schrack.

The court acknowledged that in her 2017 Creditor's Claim, Schrack alleged she "owned 50 [percent] of all Worldstar 'companies' and half of the estate and the trust"; and the court found that at her April 2020 deposition Schrack asserted new, unpled *Marvin* claims based on a different agreement allegedly made in 2009 or 2010 while the family was living in Arizona. Under this new or "modified" agreement, O'Denat promised to take care of her "for life" and, upon his death, she would receive 25 percent of the value of his estate.

In determining whether to grant the Motion, the court ruled the only claims alleged in the complaint were those arising from the parties' purported 2000 Pooling Agreement as pled by Schrack, and *not* the "new," unpled *Marvin* claims that she testified about at her April 2020 deposition. Because Schrack had not amended her May 2015 complaint to include these new claims against O'Denat's estate, the court ruled any evidence of such was outside the scope of the pleadings and therefore irrelevant.

14

In its order the court also concluded Schrack proffered insufficient evidence of an oral or implied agreement to pool their "earnings, income and assets"; and proffered no evidence to support the value of her services for purposes of her quantum meruit count. In ruling there was no pooling agreement between O'Denat and Schrack, the court also found Schrack failed to proffer clear and convincing evidence of O'Denat's intent to convey to her a beneficial interest in the assets he owned, including WSHH. (See Evid. Code, § 662, discussed *post*.)[7]

## DISCUSSION

### Summary Judgment and Standard of Review

On appeal from an order granting summary judgment, we apply an independent or de novo standard of review to determine whether triable issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*); *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 (*Wiener*).) "In ruling on the motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations] in the light most favorable to the opposing party." (*Aguilar*, at p. 843.) As such, the court will "liberally construe plaintiffs' evidentiary submissions and strictly scrutinize defendants' own evidence, in

[7]    As noted *ante*, as a separate basis for summary judgment the court found Schrack failed to include a separate statement responding to each of Dwyer's material facts in support of his Motion. (See § 437c(b)(3) [providing the "opposition papers shall include a separate statement that responds to each of the material facts contended by the moving party to be undisputed" and the "[f]ailure to comply with this requirement . . . may constitute a sufficient ground, in the court's discretion, for granting the motion"].)

order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor." (*Wiener*, at p. 1142.) Further, the court must consider "all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)

Ultimately, the purpose of summary judgment is to "provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar, supra*, 25 Cal.4th at p. 843.) A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is an affirmative defense to that cause of action. (§ 437c, subd. (*o*)(1), (2); *Aguilar*, at p. 850.) If the defendant meets that threshold burden, then the burden shifts to the plaintiff to make a prima facie showing that a triable issue of fact exists as to the cause of action set forth. (*Aguilar*, at p. 849.) "There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 845.)

### The Complaint Frames the Issues on Summary Judgment

It is axiomatic that the "complaint serves to delimit the scope of the issues before the court on a motion for summary judgment [citation], and a party cannot successfully resist summary judgment on a theory not pleaded." (*Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1576 [failure to plead reckless conduct precluded use of that theory to escape summary judgment on appeal]; see *Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1324 [the defendants moving for summary judgment are entitled to rely on allegations

in the complaint, which are judicial admissions and conclusive concessions and which frame the disputed issues]; *Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1091 [affirming the long-standing principle that the "pleadings establish the scope of an action and, absent an amendment to the pleadings, parties cannot introduce evidence about issues outside the pleadings"].)

In order to assert a new theory, a plaintiff must amend the complaint before summary judgment is filed, or, at the latest, before the hearing on the motion. (See *Sweat v. Hollister* (1995) 37 Cal.App.4th 603, 607; *580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 18 [rejecting evidence by cross-complainant in opposition to summary adjudication that offered a "different factual assertion from that alleged in the cross-complaint," when the cross-complainant did not "move to amend the cross-complaint prior to the hearing on the summary adjudication motion"].)

The reason for this rule is obvious: "The point of the summary [judgment/]adjudication procedure is to test whether a full trial is necessary. The complaint is supposed to set forth the plaintiff's proposed case, which the defendant's summary adjudication motion then aims to test as a matter of law. But if the plaintiff's opposition moves the factual target after the defendant has fired off its motion, this unfair tactic defeats the utility of the procedure." (*Cohen v. Kabbalah Centre International, Inc.* (2019) 35 Cal.App.5th 13, 18 (*Cohen*).)

In *Cohen*, the plaintiff sued the defendant for myriad causes of action including breach of oral agreement. Plaintiff stated she and the defendant orally agreed that it would return her donations of $452,000 if it did not use the money to purchase a building to house a spiritual center in San Diego; and that the defendant breached this agreement by failing to return her

donations when it decided against buying such a building. The *Cohen* court found the trial court properly granted summary adjudication on this cause of action because the plaintiff "had no *valid* evidence of this contract." (*Cohen*, *supra*, 35 Cal.App.5th at p. 17, italics added.)

The *Cohen* court disapproved of the plaintiff's "tactic" of submitting a declaration in support of her opposition to the defendant's summary judgment/adjudication motion regarding the date of the oral building contract between her and the defendant that conflicted with the date of this contract set forth in her fifth amended complaint, which amendment she based on her deposition testimony. (*Cohen*, *supra*, 35 Cal.App.5th at p. 17.) By coming up with a "new story" in opposition to the defendant's motion, the Court of Appeal noted plaintiff "evidently hoped to avoid her past deposition admission that in 2004 she had *not* asked [the defendant] to restrict its use of her donations to building construction." (*Id.* at p. 18, italics added.) Because the trial court "correctly disregarded [the plaintiff's] new and contradictory version of events" in her declaration (*id.* at p. 19), the Court of Appeal held she was left "with no evidence to support her claim about an oral contract about her building fund donations, which rightly failed in the trial court and now fails on appeal" (*ibid.*).

### Analysis

We conclude the trial court properly refused to consider Schrack's evidence in opposition to summary judgment based on O'Denat's alleged promise, while they were living in Arizona in 2009/2010, that he would take care of her "for life" and, upon his death, she would receive 25 percent of his estate (i.e., the 2010 Agreement) in return for her taking care of the children, the household, and his medical needs. As the trial court correctly noted, Schrack's April 2020 deposition testimony regarding the existence of this

purported 2010 Agreement presented a new, unpled theory that was *not* based on the pleaded 2000 Pooling Agreement, which was the basis of her *Marvin* claims in her May 2015 complaint.

Moreover, if there was any doubt regarding the contract on which Schrack based her pleaded *Marvin* claims, that was clarified by Schrack in her verified 2017 Creditor's Claim she filed in the Probate Action. In support of her $30 million Claim (excluding child support), she unambiguously stated that O'Denat "entered into an agreement with [her] . . . in *January 2000 to pool their earnings, income, and assets*" (italics added); that the "primary asset is *ownership* of the [WSHH] brand, trademark, and related intellectual property" (italics added); and that she "is entitled to *fifty percent ownership* of [WSHH] and *half of the assets of the estate and trust*." (Italics added.) As noted, Schrack supported her 2017 Creditor's Claim by *attaching and incorporating by reference* a copy of her May 2015 complaint, thus confirming the purported contract she sought to enforce.

Thus, when Dwyer filed his Motion in February 2020 seeking to establish as a matter of law there was no oral or implied contract between Schrack and O'Denat, it was based on their purported 2000 Pooling Agreement. However, not unlike the plaintiff in *Cohen*, once summary judgment was filed, Schrack pivoted and came up with a "new story" regarding the existence of a purported separate, modified agreement that, if credited, might have created a triable issue of material fact and allowed her to avoid summary judgment.

Under this new, unpled theory, Schrack asserted for the first time at her April 2020 deposition that O'Denat in 2009/2010 had agreed to support her for life *and* leave her a 25 percent interest in his estate, regardless of whether she was an owner in the "earnings, income and assets" they had

19

accumulated during their 13-year relationship. Schrack therefore no longer claimed she was a beneficial owner in WSHH, O'Denat's estate's most valuable asset.

As noted, Schrack argues the purported 2010 Agreement merely provides the "details" of their *Marvin* agreement that she "generally and broadly alleged" in her May 2015 "form complaint." Having filed a "general form complaint," she further argues the trial court "misconstrued the evidentiary facts as raising new theories of liability that had never been alleged." We find these and her related arguments unavailing.

First, Schrack cites no authority to support her argument the trial court erred in failing to broadly construe her complaint to include the purported 2010 Agreement merely because she used a "Judicial Council form complaint" in pleading her *Marvin* action. Nor have we found any authority to support such an argument. For this reason alone we reject this argument. (See *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 [a court of review "may disregard conclusory arguments that are not supported by pertinent legal authority"]; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [arguments on appeal not supported by " ' "citations to authority" ' " result in forfeiture].)

Second, we reject this claim on the merits. We can discern of no reason why a party's use of a Judicial Council form complaint should lessen the party's burden to allege specific and sufficient facts to apprise a defendant of the basis upon which the plaintiff seeks relief. (*Pich v. Lightbourne* (2013) 221 Cal.App.4th 480, 496; *Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1099 ["It has been consistently held that ' "a plaintiff is required only to set forth the essential facts of his case with reasonable precision and with particularity sufficient to

acquaint a defendant with the nature, source and extent of his cause of action" ' "]; § 425.10 ["(a) A complaint or cross-complaint shall contain . . . (1) A statement of the facts constituting the cause of action, in ordinary and concise language."].)

Third, we disagree with Schrack's characterization that her unpled *Marvin* claims arising from the purported 2010 Agreement merely effected the amount she would receive from O'Denat's estate, but had no bearing on her pleaded injury, which, according to her, was still based on *Marvin* and O'Denat's breach of a purported oral or implied contract.

Because Schrack was not a titled co-owner on any asset held by O'Denat's estate, including WSHH, the specifics of any purported agreement between her and O'Denat regarding her alleged entitlement to an interest in any assets owned by his estate has significant legal consequences. (See Evid. Code, § 662 ["The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted *only by clear and convincing proof*" (italics added)]; *Basich v. Allstate Ins. Co.* (2001) 87 Cal.App.4th 1112, 1118-1121 [in reviewing a defendant's summary judgment motion in which the plaintiff's burden of proof at trial on a claim or issue is "clear and convincing" evidence, the plaintiff can only defeat the motion by offering evidence that meets this higher standard of proof].)

Here, the court concluded that in opposition to the summary judgement motion, Schrack failed to offer any evidence to support a finding O'Denat intended she hold a beneficial interest in WSHH. Instead, the court found the evidence "demonstrated no intention or plan on [O'Denat's] part to ever convey any sort of interest or title to [Schrack] in any of his businesses." Schrack has not challenged this finding on appeal. (See *Christoff v. Union*

21

*Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 ["an appellant's failure to discuss an issue in its opening brief forfeits the issue on appeal"].)

Fourth, we disagree with Schrack that her discovery responses put O'Denat (now Dwyer) on notice of her theory of recovery against O'Denat's estate based on the purported 2010 Agreement. In her May 2016 responses to form interrogatory No. 50.1, Schrack described the contract alleged in her May 2015 complaint as being "created between the parties . . . through their actions and conduct, during the formation of the business *while in Pennsylvania from 2000 to 2007*, *to pool their earnings, income and assets* and *share* in the fruits, assets and accumulations acquired during the course of the relationship . . . ." (Italics added.) Schrack also stated that, after their second child was born in November 2006, O'Denat told her "he would always take care of [her] and the boys as [she] and the boys were his family"; and that after his heart attack in 2009, O'Denat created the 2011 O'Denat Trust and told her that "his attorney was going to provide [her] with money each month, and that when the business sold, she was to receive the bulk of the proceeds."

As is clear from her response to No. 50.1, Schrack principally relied on the purported 2000 Pooling Agreement she and O'Denat allegedly negotiated while living in Pennsylvania to support her breach of contract claims. Schrack reaffirmed her reliance on the existence of a pooling agreement in her response to form interrogatory No. 9.1. There she stated the damages attributable to the "**INCIDENT**," which she understood to mean the "breach of contract giving rise to this action or proceeding," were equal to a "*fifty percent share of the value of the business* founded and developed during

Plaintiff and Defendant's relationship and *fifty percent share of any other assets* accumulated during their relationship."[8] (Italics added.)

Schrack's statement of damages in response to No. 9.1 stands in stark contrast to her April 2020 deposition testimony in which she expressly stated she was *not* claiming an ownership interest in WSHH, entitling her to a 50 percent "share of the value of the business." Schrack's responses to the form interrogatories thus support the trial court's conclusion that the purported 2010 Agreement was a new theory based on a modified or different oral or implied contract between her and O'Denat that was not pled by Schrack in her May 2015 complaint.

Finally, we note that Schrack had *years* to amend her complaint to add her new theory and/or claims based on the purported existence of the 2010 Agreement, which terms, as a party to this contract, ostensibly were always known to her. Schrack, however, never sought to amend her complaint. Instead, she waited until after Dwyer had filed his Motion to announce her breach of contract claims were based on a theory other than the purported 2000 Pooling Agreement and her being a beneficial owner of WSHH and the estate's other assets, despite what she stated in her complaint, discovery responses, and 2017 Creditor's Claim. By moving the "factual target" tested by Dwyer after he "fired off" his Motion, Schrack defeated the purpose of summary judgment, which was to determine whether a trial was necessary on the claims framed by her complaint. (See *Cohen*, *supra*, 35 Cal.App.5th at p. 19.)

---

[8] Schrack's response to No. 9.1 also included an objection, claiming this interrogatory called for an "expert opinion."

23

Exercising our de novo review, for these reasons we conclude the trial court properly granted summary judgment for Dwyer. (See *Wiener*, *supra*, 32 Cal.4th at p. 1142; *Aguilar*, *supra*, 25 Cal.4th at p. 860.)[9]

### DISPOSITION

The judgment for Dwyer, as successor-in-interest to the Estate of Lee O'Denat, is affirmed. Dwyer to recover his costs of appeal.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DO, J.

---

[9]    In light of our decision, we deem it unnecessary to address the parties' other arguments including Dwyer's contention that Schrack was barred by res judicata (i.e., claim preclusion) from litigating her *Marvin* claims after the trial court dismissed the Dissolution Action with prejudice; and Schrack's contention that the court erred in making various evidentiary rulings separate and apart from its exclusion on relevancy grounds of all evidence of the new, unpled claims arising from the purported 2010 Agreement she and O'Denat allegedly negotiated.